AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of Columbia

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

INFORMATION ASSOCIATED WITH ONE ACCOUNT
STORED AT PREMISES CONTROLLED BY TWITTER,
INC. PURSUANT TO 18 U.S.C. § 2703 FOR
INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956

)
)
)
)
)
)
)

Case No.  22-SC-2024

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

Located in the jurisdiction of the _____ District of Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|

18 U.S.C. § 1956 (money laundering); 18 U.S.C. § 1960 (unlicensed money transmission); D.C. Code § 26-1023(c) (money transmission without a license).

The application is based on these facts:

See Affidavit in Support of Application for Search Warrant.

- ❏ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Leo Rovensky, Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

telephone _____ *(specify reliable electronic means).*

Date: _____ 8/9/2022 _____

_____
*Judge's signature*

City and state: _____ Washington, D.C. _____

Robin M. Meriweather
_____
United States Magistrate Judge

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original                    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| In the Matter of the Search of | |
|---|---|
| *(Briefly describe the property to be searched* | ) |
| *or identify the person by name and address)* | ) |
| INFORMATION ASSOCIATED WITH ONE ACCOUNT | ) Case No.  22-SC-2024 |
| STORED AT PREMISES CONTROLLED BY TWITTER, | ) |
| INC. PURSUANT TO 18 U.S.C. § 2703 FOR | ) |
| INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the jurisdiction of the _____District of Columbia_____.
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A (incorporated by reference).

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B (incorporated by reference).

**YOU ARE COMMANDED** to execute this warrant on or before _____August 23, 2022_____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Robin M. Meriweather_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)* ☐ until, the facts justifying, the later specific date of _____.

Date and time issued: _____8/9/2022_____

_____
*Judge's signature*

City and state: _____Washington, D.C._____

_____Robin M. Meriweather_____
United States Magistrate Judge

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br><br>22-SC-2024 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|  |

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date: _____

 

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

**Property to Be Searched**

This warrant applies to information associated with the Twitter Account

**@BitcoinFog**   (the "Account")

that is stored at premises owned, maintained, controlled, or operated by Twitter, Inc., a company

headquartered at 1355 Market Street, Suite 900, San Francisco, CA.

## **ATTACHMENT B**

**Particular Things to Be Seized and Procedures
to Facilitate Execution of the Warrant**

**I.      Information to be disclosed by Twitter (the "Provider") to facilitate execution of the warrant**

To the extent that the information described in Attachment A (the "**Target Account**") is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside the United States, and including any communications, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information (from **September 1, 2011, to present**) to the government for the **Target Account** listed in Attachment A:

a.      All business records and subscriber information, in any form kept, pertaining to the Target Account, including:

1.      Identity and contact information (past and current), including full name, e-mail address, physical address, date of birth, phone number, gender, and other personal identifiers;

2.      All usernames (past and current) and the date and time each username was active, all associated accounts (including those linked by machine cookie, IP address, email address, or any other account or device identifier), and all records or other information about connections with third-party websites and mobile apps (whether active, expired, or removed);

3.      Length of service (including start date), types of services utilized, purchases, and means and sources of payment (including any credit card or bank account number) and billing records;

4.      Devices used to login to or access the account, including all device identifiers, attributes, user agent strings, and information about networks and connections, cookies, operating systems, and apps and web browsers;

5.      All advertising information, including advertising IDs, ad activity, and ad topic preferences;

6.     Internet Protocol ("IP") addresses used to create, login, and use the account, including associated dates, times, and port numbers;

7.     Privacy and account settings, including change history; and

8.     Communications between Twitter and any person regarding the account, including contacts with support services and records of actions taken;

B.     All content, records, and other information relating to communications sent from or received by the Target Account, including but not limited to:

1.     The content of all Tweets created, drafted, favorited/liked, or retweeted by the Target Account, and all associated multimedia, metadata, and logs;

2.     The content of all direct messages sent from, received by, stored in draft form in, or otherwise associated with the Target Account, including all attachments, multimedia, header information, metadata, and logs;

C.     All other content, records, and other information relating to all other interactions between the Target Account and other Twitter users, including but not limited to:

1.     All users the Target Account has followed, unfollowed, muted, unmuted, blocked, or unblocked, and all users who have followed, unfollowed, muted, unmuted, blocked, or unblocked the Target Account;

2.     All information from the "Connect" or "Notifications" tab for the account, including all lists of Twitter users who have favorited or retweeted tweets posted by the account, as well as all tweets that include the username associated with the account (i.e., "mentions" or "replies");

3.     All contacts and related sync information; and

4.     All associated logs and metadata;

D.     All other content, records, and other information relating to the use of the Target Account, including but not limited to:

1.     All data and information associated with the profile page, including photographs, "bios," and profile backgrounds and themes;

2.     All multimedia uploaded to, or otherwise associated with, the Target Account;

3.     All records of searches performed by the Target Account;

4.     All location information, including all  location data collected by any plugins, widgets, or the "Tweet With Location" service, from; and

2

5.     All information about the Target Account's use of Twitter's link service, including all longer website links that were shortened by the service, all resulting shortened links, and all information about the number of times that a link posted by the Target Account was clicked.

//

//

//

Within 14 days of the issuance of this warrant, PROVIDER shall deliver the information set forth above via United States mail, courier, or email to the following:

Leo Rovensky
Special Agent
Internal Revenue Service
Leo.Rovensky@ci.irs.gov
973-885-4062

3

II.    **Information to be Seized by Law Enforcement**

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of 18 U.S.C. §§ 1956 (Money Laundering) and 1960 (Unlicensed Money Service Business) and D.C. Code § 26-1023(c) (money transmission without a license), and  including information pertaining to the following matters:

    a.  Information that constitutes evidence of the identification or location of the user(s) of the TARGET ACCOUNT;

    b.  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation and underlying specified unlawful activities; or (ii) communicated with the TARGET ACCOUNT about matters relating to the criminal activity under investigation and underlying specified unlawful activities, including records that help reveal their whereabouts;

    c.  Information that constitutes evidence concerning how and when the TARGET ACCOUNT was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the criminal activity under investigation and to the TARGET ACCOUNT user(s);

    d.  Information concerning the development, operation, or use of Bitcoin Fog, or any associated site or service;

    e.  Information concerning how the person(s) developing and operating Bitcoin Fog, or any associated site or service aided and abetted and/or conspired with users of

4

those services in furtherance of criminal offenses, as described in the affidavit submitted in support of this Warrant;

f.   Records and information relating to individuals associated with the TARGET ACCOUNT, including the identity or location of owners, administrators, moderators, and operators, aiders and abettors, coconspirators, and accessories after the fact, and the identity of the users of the TARGET ACCOUNT or any similar/related website, as well as communications by or among those individuals;

g.   Information regarding the individual(s) using the TARGET ACCOUNT;

h.   Records and information relating to the users of the TARGET ACCOUNT or any similar/related accounts, including customer lists, contacts, and identifying information, as well as communications by or among those individuals;

i.   Evidence related to financial information, including but not limited to:

    i.   Evidence related to any virtual currency data or transaction, including the details and context of any such transaction;

    ii.   Evidence related to the transportation or transmission of funds, including virtual currencies (such as bitcoin), that have been derived from the investigated crimes, including those that are intended to be used to promote, conceal, or support further criminal activity;

    iii.   Financial account information, cryptocurrency records, bank records, bank statements, credit card bills, bank account numbers, money drafts, letters of credit, money orders, cashier's checks, or bank checks;

    iv.   means or source of payment for service (including any credit card, bank

5

        account number, or bitcoin wallet addresses);

    v.  any other financial records or items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money;

j.  Evidence related to conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business;

k.  Evidence related to money transmitting licenses and business registration;

l.  The identity of the persons who communicated with the TARGET ACCOUNT about matters relating to conducting, controlling, managing, supervising, directing, and/or owning all or part of an unlicensed money transmitting business, including records that help reveal their whereabouts;

m.  Evidence indicating the state of mind of the TARGET ACCOUNT user(s), *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation.

**III. Government procedures for warrant execution**

The United States government will conduct a search of the information produced by the Provider and determine which information is within the scope of the information to be seized specified in Section II. That information that is within the scope of Section II may be copied and retained by the United States.

Law enforcement personnel will then seal any information from the Provider that does not fall within the scope of Section II and will not further review the information absent an order of the Court. Such sealed information may include retaining a digital copy of all information received pursuant to the warrant to be used for authentication at trial, as needed.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ONE ACCOUNT STORED AT PREMISES CONTROLLED BY TWITTER, INC. PURSUANT TO 18 U.S.C. § 2703 FOR INVESTIGATION OF VIOLATION OF 18 U.S.C. § 1956 | SC No. 22-SC-2024 |

Reference:     USAO Ref. # 2015R02056; Subject Account: Twitter Account @BitcoinFog

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Leo Rovensky, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a warrant to search information associated with the Twiter account @BitcoinFog (the "**TARGET ACCOUNT**"), which is stored at premises owned, maintained, controlled, or operated by Twitter, Inc. ("Twitter") ("PROVIDER"), an electronic communications service and/or remote computing service provider headquartered at 1355 Market Street, Suite 900, San Francisco, CA.  The information to be searched is described in the following paragraphs and in Attachment A.

2.      This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require PROVIDER to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

1

3.      I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI).  I have been a Special Agent with IRS-CI since 2008.  My responsibilities include the investigation of criminal violations of the Internal Revenue Code (Title 26, United States Code), the Money Laundering Control Act (Title 18, United States Code, Sections 1956 and 1957), the Bank Secrecy Act (including relevant parts of Title 31, United States Code), and related offenses. I have experience investigating crimes involving virtual currency and am currently assigned to the Cyber Crimes Unit within IRS-CI.  I am experienced in analyzing and tracing virtual currency transactions.  I have also received training in cyber operations and in criminal schemes perpetrated via the Internet.  During my work with the IRS-CI, I have been the affiant on, executed, and/or participated in the execution of search warrants, and have seized evidence associated with violations of federal and state laws.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 1956 (money laundering) and 1960 (unlicensed money transmission) and D.C. Code § 26-1023(c) (money transmission without a license) have been committed by the user(s) of the TARGET ACCOUNT.  There is also probable cause to search the information described in Attachment A for evidence of these crimes further described in Attachment B.

## JURISDICTION

6.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). As discussed more fully below, acts or omissions in furtherance of the offenses under investigation occurred within Washington, DC. *See* 18 U.S.C. § 3237.  Additionally, the criminal offenses under investigation began or were committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district. *See* 18 U.S.C. § 3238. Further, the statute setting forth one of the federal offenses under investigation, namely 18 U.S.C. § 1956, applies extraterritorially.

## BACKGROUND RELATED TO VIRTUAL CURRENCY

### I.     Bitcoin

7.     Bitcoin ("BTC") is a decentralized virtual currency, which is circulated over the Internet and which is not backed by a government.  BTC is supported by a peer-to-peer network. All transactions are recorded on BTC's public ledger, called the blockchain.  Although transactions are visible on the public ledger, each transaction is only listed by a complex series of letters and numbers that does not identify the individuals involved in the transaction.  This feature makes virtual currency transactions pseudo-anonymous; however, it is sometimes possible to determine the identity of an individual involved in a virtual currency transaction by analyzing the blockchain and obtaining related records.  For this reason, many criminal actors who use virtual currency to facilitate illicit transactions online (*e.g.*, to buy and sell illegal drugs or other unlawful items or services) look for ways to make their transactions even more anonymous.

3

8.      BTC is sent to and from virtual currency "addresses," roughly equivalent to anonymous account numbers.  One person may easily create and control many BTC addresses. Like sending and receiving an email via an email address, a user can send and receive BTC via a BTC address.  People commonly have many different BTC addresses, and an individual could theoretically use a unique address for every transaction in which they engage.  A user can also send BTC from multiple addresses in one transaction; however, to spend virtual currency held within a BTC address, the user must have a private key, which is generated when the address is created and is shared only with the address key's initiator.  Similar to a password, a private key ensures secured access to the virtual currency.  Consequently, only the holder of a private key for a virtual currency address can spend from the address.  Although the owners of virtual currency addresses generally are not known unless the information is made public by the owner (*e.g.*, by posting the address in an online forum or providing the address to another user for a transaction), analyzing the blockchain can sometimes lead to identifying both the owner of an address and other accounts that the person or entity owns and controls.

9.      Virtual currency is often transacted using a virtual currency exchange ("VCE"), which typically acts as a trading platform and storage platform.  Most VCEs facilitate trading between the U.S. dollar, other fiat currencies, BTC, and other virtual currencies.  Many VCEs also

store their customers' virtual currency in virtual currency "wallets."[1]  These wallets can hold

multiple BTC addresses associated with a user on a VCE's network.

10.     Because these VCEs act as money services businesses, they are legally required,

under the Bank Secrecy Act, codified at 31 U.S.C. § 5311 *et seq*., to conduct due diligence of their

customers (*i.e.*, Know Your Customer ("KYC") checks).  They are also required to have anti-

money laundering ("AML") programs in place.  In other words, a U.S.-based VCE is required to

collect identifying information of their customers and verify their clients' identities.

11.     Since the BTC blockchain serves as a searchable public ledger of every BTC

transaction, investigators may trace transactions to VCEs.  Because those VCEs collect identifying

information about their customers, subpoenas or other appropriate legal process submitted to these

VCEs can, in some instances, reveal the true identity of the individual responsible for the

transaction.

## II.     Blockchain Analysis

12.     As previously stated, while the identity of a BTC address owner is generally

anonymous, law enforcement can often identify the owner of a particular BTC address by

analyzing the BTC blockchain.  The analysis can also reveal additional addresses controlled by the

same individual or entity.  "For example, when an organization creates multiple Bitcoin addresses,

---

[1] BTC wallets hosted by third parties (*e.g.*, VCEs) are sometimes called "hosted wallets," because
the third party holds a customer's funds on the third party's platform until a customer requests that
the third party release the funds for a transaction.  This is similar to the relationship a customer has
with a bank: the bank holds the customer's funds until the customer requests a transfer. I n contrast,
virtual currency wallets that allow a user to exercise total, independent control over their funds
(*i.e.*, do not require a third party's involvement to facilitate a transaction) are called "unhosted" or
"self-hosted" wallets.

it will often combine its [BTC] addresses into a separate, central [BTC] address (*i.e.*, a "cluster"). It is possible to identify a 'cluster' of [BTC] addresses held by one organization by analyzing the [BTC] blockchain's transaction history.  Open source tools and private software products can be used to analyze a transaction." *United States v. Gratkowski*, 964 F.3d 307, 309 (5th Cir. 2020).

13.     Law enforcement uses commercial services offered by several different blockchain-analysis companies to investigate virtual currency transactions.  These companies analyze the BTC blockchain (as well as the blockchains for other virtual currencies) and attempt to identify the individuals or groups involved in transactions.  Through numerous unrelated investigations, law enforcement has found the information provided by these companies to be reliable.

### III.     The Tor Network

14.     The Tor network is designed specifically to facilitate anonymous communication over the Internet.  In order to access the Tor network, a user must install Tor software either by downloading an add-on to the user's web browser or by downloading the free "Tor browser bundle" available at www.torproject.org.   Use of the Tor software bounces a user's communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual Internet Protocol ("IP") address, which could otherwise be used to identify a user.

15.     Because of the way Tor routes communications through other computers, traditional IP identification techniques are not viable.  Meaning, when a user on the Tor network accesses a website, for example, the IP address of a Tor "exit node," rather than the user's actual IP address, shows up in the website's IP log.  An exit node is the last computer through which a

6

user's communications were routed.  There is no practical way to trace the user's actual IP address back through that Tor exit node IP address.

16.     Within the Tor network itself, entire websites can be set up as "hidden services." "Hidden services" operate in the same way as regular public websites with one critical exception: the IP address for the web server is hidden and instead is replaced with a Tor-based web address, which is a series of algorithm-generated characters, such as "asdlk8fs9dflku7f" followed by the suffix ".onion."  A user can only reach these "hidden services" if the user is employing the Tor client and operating in the Tor network.  And, unlike an open, public Internet website, it is not possible to determine the IP address of a computer hosting a Tor "hidden service" by using publicly available lookup tools.  As a result, neither law enforcement nor Tor users can determine the location of the computer that hosts such a website through those public lookups.

### IV.     Darknet Markets

17.     "Darknet markets" are commercial websites that are typically hosted as Tor hidden services.  Darknet markets primarily function as black markets where one can sell or broker transactions involving illegal drugs, cybercriminal tools (*e.g.*, malware), weapons, counterfeit currency, stolen personally identifiable information, forged documents and identification credentials, and other illicit goods and services.  BTC is the most common method of payment for products and services procured on darknet markets.

18.     Two publicly available examples of now defunct darknet markets that operated as Tor hidden services are Silk Road Market ("Silk Road") and AlphaBay Market ("AlphaBay"). Silk Road was the first modern darknet market.  It was best known as a platform for buying and

selling illegal drugs.  It was in operation from approximately 2011 until 2013, when it was shut down following a long-term U. S. law enforcement investigation.

19.    AlphaBay was active from approximately 2014 until 2017, when it was shut down following an investigation conducted by U.S. authorities.  While active, AlphaBay had more than 400,000 users.  Like Silk Road, AlphaBay was a popular forum for buying and selling illegal drugs. Below is a screenshot of what AlphaBay looked like while operational:



## PROBABLE CAUSE

20.    The Internal Revenue Service, Criminal Investigation (IRS-CI) and the Federal Bureau of Investigation (FBI) have been investigating an illicit Bitcoin money transmitting and money laundering service called BITCOIN FOG.     As described further below, the investigation identified Roman STERLINGOV as the operator of BITCOIN FOG.    On April  26,  2021, STERLINGOV was charged by complaint in the District of Columbia with money laundering, in violation of 18 U.S.C. § 1956(a)(3); unlicensed money transmission, in violation of 18 U.S.C. § 1960; and  money  transmission  without  a  license,  in  violation  of

D.C. Code § 26-1023(c).  STERLINGOV was arrested shortly after midnight on April 27, 2021, after he traveled from Moscow to the Los Angeles International Airport.  On June 14, 2021, a grand jury in the District of Columbia returned and indictment charging STERLINGOV with the same counts as the complaint.  On July 18, 2022, a grand jury in the District of Columbia returned a superseding indictment, adding a count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h).

**BITCOIN FOG Background**

21.     BITCOIN FOG was an Internet-based service accessible from the District of Columbia and U.S. states.   As of April 26, 2021, BITCOIN FOG could be accessed through the Tor hidden service located at http://foggeddriztrcar2.onion.[2]   BITCOIN FOG functioned as a Bitcoin "tumbler" or "mixer" service.[3]  It allowed users to send bitcoins to designated recipients in a manner designed to conceal and obfuscate the source of the bitcoins.    It worked by disassociating incoming bitcoin from particular Bitcoin addresses or transactions and then comingling that bitcoin with other incoming bitcoin prior to conducting any further transactions.  This process allowed BITCOIN FOG customers engaged in unlawful activities to launder their proceeds by concealing the nature, source, and location of their "dirty" bitcoin.  BITCOIN FOG publicly advertised this service as a way to help users obfuscate the source of their bitcoin.  BITCOIN FOG charged customers a fee for this service.

22.     BITCOIN FOG was launched on or about October 27, 2011, and was operational as of April 26, 2021.  The site went down shortly after STERLINGOV's arrest.  The website was one of the original Bitcoin tumbling sites on the darknet.  As described below, more than 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) were sent

through the site from in or about October 2011 through April 26, 2021.  The largest senders of BTC through BITCOIN FOG were darknet markets, such as Agora, Silk Road 2.0, Silk Road, Evolution, and AlphaBay, that primarily trafficked in illegal narcotics and other illegal goods.

23.     BITCOIN FOG was publicly advertised on Internet forums and well-known web pages promoting darknet markets as a tool for anonymizing bitcoin transactions.   The administrator of BITCOIN FOG publicly promoted the service through a clearnet site (www.bitcoinfog.com and www.bitcoinfog.info) and a Twitter page.  These outlets allowed users to easily locate and access the hidden services site through simple clearnet Internet searches.

**BITCOIN FOG Operated as an Illegal Money Transmitting and Money Laundering Service on the Darknet**

24.     Using blockchain analysis, law enforcement confirmed that over 1.2 million BTC (valued at approximately $335,809,383 at the time of the transactions) have been sent through BITCOIN FOG since the site was launched in 2011.  This figure includes BTC from various sources: all direct and indirect transactions from sources such as darknet markets; funds stolen from other bitcoin addresses through hacks; direct deposits and withdrawals from bitcoin wallets; sends and receives from wallets not apparently affiliated with a known hosted service; and other unknown sources.   IRS-CI personnel reviewed all inputs and outputs from BITCOIN FOG to identify bitcoins sent directly to BITCOIN FOG from known darknet markets and bitcoins sent from BITCOIN FOG to known darknet markets.   IRS-CI's analysis determined BITCOIN FOG received approximately 486,861.69 BTC (approximately $54,897,316.44 at the time of the transactions) *directly* from darknet markets.    BITCOIN FOG sent approximately 164,931.13 BTC (approximately $23,690,956.28 at the time of the transactions) *directly* to darknet markets.

In sum, BITCOIN FOG sent or received more than $78 million in transactions involving known darknet markets, counting only direct transactions.

25.     Among these, IRS-CI cyber analysts identified direct deposits into BITCOIN FOG from at least 35 darknet markets.  Below are the top five markets by U.S. dollar value of deposits:

| Source Market | Total Received (BTC) | Total Received (USD) |
|---|---|---|
| Agora Market | 41,966.87 | $14,398,754.73 |
| Silk Road 2.0 Market | 22,863.74 | $12,518,636.97 |
| Silk Road Marketplace | 377,102.74 | $9,556,159.49 |
| Evolution Market | 11,100.79 | $3,199,542.15 |
| AlphaBay Market | 5,442.86 | $2,907,508.67 |

26.     IRS-CI cyber analysts identified funds sent directly from BITCOIN FOG to at least 51 different darknet markets. Below are the top five markets by dollar value of sends:

| Destination Market | Total Sent (BTC) | Total Sent (USD) |
|---|---|---|
| Agora Market | 26,398.12 | $8,680,430.34 |
| Silk Road 2.0 Market | 11,274.21 | $5,871,831.33 |
| Silk Road Marketplace | 106,522.77 | $2,289,509.42 |
| Evolution Market | 6,473.24 | $1,860,053.75 |
| AlphaBay Market | 3,375.90 | $1,557,931.95 |

27.     Based on my training and experience, including experience in other darknet investigations, darknet markets exist primarily to traffic in illegal narcotics and other illegal goods and services – a fact well-known among darknet market user and administrators, and intended by the administrators.  In particular, darknet markets sell stolen personally identifiable information, financial information including credit card numbers, and computer hacking tools and exploits. That the darknet markets listed above primarily traffic in illegal narcotics and the other illegal

goods and services noted would be apparent to anyone using the markets because the categories listed on each market, and the majority of specific listings, openly discuss illegal goods and services.   I am familiar with each of the darknet markets listed in the tables above and am aware that illegal narcotics and other illegal goods and services constituted the majority of items for sale on each market.   Accordingly, there is probable cause to believe that the bitcoin transactions sent to and from BITCOIN FOG involved the proceeds of "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), such as narcotics distribution (21 U.S.C. § 841); identity theft and the sale of stolen personally identifiable information (PII) (18 U.S.C. § 1028A); and computer fraud and abuse, including the sale of computer hacking tools and exploits (18 U.S.C. § 1030).

## **Undercover Transactions on BITCOIN FOG**

### *September 2019 Undercover Transaction*

28.    On or about September 11, 2019, an IRS-CI Special Agent (UC) physically located in the District of Columbia and operating in an online undercover capacity accessed BITCOIN FOG at foggeddriztrcar2.onion through the Tor browser.  The UC created an account through the registration page by creating a username and password and entering a security text phrase pictured below the registration text boxes.  The registration page of BITCOIN FOG stated: "As an anonymous service, we do not collect any additional information about you besides a user name and password."

29.    When creating the account, the UC was never asked for any identifying information such as an email account, date of birth, social security number, or passport number, or for any other proof of identification.

30.    On or about September 11, 2019, while physically located in the District of

12

Columbia, the UC sent approximately 0.02488936 BTC ($249.99) from an IRS-CI controlled covert wallet ("UC Sending Wallet") into a wallet address provided by BITCOIN FOG.

31.     On or about September 12, 2019, while physically located in the District of Columbia, the UC accessed foggeddriztrcar2.onion.  The UC's undercover BITCOIN FOG account showed a balance of approximately 0.02425700.  The difference of approximately 0.00063236 BTC between the amount the UC deposited and the balance shown is approximately 2.5% of the total deposit.  This is the service fee charged by BITCOIN FOG.  On or about September 12, 2019, while physically located in the District of Columbia, the UC sent 0.02 BTC from BITCOIN FOG to an IRS-CI controlled covert wallet ("UC Receiving Wallet").

32.     Through blockchain analysis, investigators traced bitcoin from the BITCOIN FOG deposit address to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the UC Receiving Wallet and confirmed that the bitcoin was sourced from BITCOIN FOG clusters.

33.     Investigators were unable to directly trace any direct link between the "UC Sending Wallet" and the "UC Receiving Wallet," confirming that BITCOIN FOG successfully tumbled the transaction by breaking the link in the blockchain between the source and ultimate destination of the funds.

***November 2019 Undercover Transaction***

34.     On or about November 18, 2019, while physically located in the District of Columbia, an IRS-CI Special Agent (UC) operating in an online undercover capacity sent approximately 0.01173987 BTC to BITCOIN FOG from an IRS-CI controlled undercover

account on the Apollon darknet market.  Apollon was a darknet market known to sell illegal narcotics, stolen PII, and other illegal items.  On November 19, 2019, while physically located in the District of Columbia, the SA accessed BITCOIN FOG at foggeddriztrcar2.onion.  The UC's undercover account on BITCOIN FOG showed that the account had been credited by the amount of the send transaction, less an approximately 2.32% fee.

35.     On or about November 19, 2019, while physically located in the District of Columbia and after confirming the deposit of funds from Apollon Market had been credited to the UC's BITCOIN FOG account, the UC sent the message below to the BITCOIN FOG administrator using the messaging function on the BITCOIN FOG site, stating the funds were the proceeds of illegal narcotics sales:



36.     On or about November 21, 2019, while physically located in the District of Columbia, the UC again accessed BITCOIN FOG operating in an online undercover capacity. There was no response to the above message posted by the SA on or about November 19, 2019.

The UC then directed BITCOIN FOG to send 0.01146764 BTC from the undercover account on BITCOIN FOG to an IRS-CI controlled undercover wallet.  BITCOIN FOG did so.

37.    The UC clearly stated that the BTC was from the sale of ecstasy/molly, an illegal narcotic.  At no point did the administrator of BITCOIN FOG prevent the deposit of funds from Apollon or prevent the withdrawal of funds after the funds were represented to be the proceeds of illegal drug sales.

38.    Through blockchain analysis, investigators traced bitcoin from the IRS-CI controlled account on Apollon Market, to the BITCOIN FOG deposit address, to known BITCOIN FOG bitcoin clusters identified through blockchain analysis.  IRS-CI investigators also traced bitcoin sent to the IRS-CI controlled undercover wallet and confirmed that the bitcoin was sourced from a BITCOIN FOG address.

**BITCOIN FOG Is Not Registered with FinCEN or Licensed in the District of Columbia**

39.    Records from the Financial Crimes Enforcement Network ("FinCEN"), a division of the U.S. Department of Treasury, revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was registered as a money services business under federal law, despite conducting transactions with U.S.-based customers.  Similarly, records from the District of Columbia Department of Insurance and Banking (DISB) revealed that neither ROMAN STERLINGOV nor BITCOIN FOG was licensed as a money transmitter under District of Columbia law, despite conducting transactions with persons based in the District of Columbia.

**Attribution of BITCOIN FOG to ROMAN STERLINGOV**

40.    Analysis of bitcoin transactions, financial records, Internet service provider

records, e-mail records, and additional investigative information identified ROMAN STERLINGOV as the principal operator of BITCOIN FOG.

*"Akemashite Omedotou" and the Shormint@hotmail.com Account*

41.     Early in the investigation, identifiers connected BITCOIN FOG to the pseudonym Akemashite Omedotou and the email account shormint@hotmail.com.  As discussed further below, BITCOIN FOG's launch was announced in a posting on the BitcoinTalk.org forum on or about October 27, 2011, by a user called Akemashite Omedetou.  Records from BitcoinTalk.org for the account associated with Akemashite Omedetou revealed that the account was created on or about October 25, 2011, using email address shormint@hotmail.com.  The account registration information included the website title "Bitcoin Fog" and website URL http://www.bitcoinfog.com.

*Connecting the BITCOIN FOG Domain to STERLINGOV*

42.     Additional investigation, as described below, connects STERLINGOV to the original BITCOIN FOG clearnet domain.

43.     According to publicly available WhoIs information, www.bitcoinfog.com was registered through the web hosting service Highhosting.net on October 25, 2011.  The WhoIs records showed that the domain was registered to "Akemashite Omedetou" using email address shormint@hotmail.com.  Records from Highhosting.net revealed that Akemashite Omedetou used a Liberty Reserve account (Liberty Reserve Account 1) to pay for the domain.  Liberty Reserve records showed that Liberty Reserve Account 1 was registered to shormint@hotmail.com.

16

44.   Investigators reviewed the account activity associated with Liberty Reserve Account 1 and determined that STERLINGOV had funded the account using a series of layered transactions through multiple payment platforms, performed in close temporal proximity and apparently designed to make it difficult to trace the payment to his true identity.  Specifically:

a.   On September 29, 2011, according to records from the virtual currency exchange Mt. Gox, Roman STERLINGOV opened an account in his true name at Mt. Gox (Mt. Gox Account 1), using the email address plasma@plasmadivision.com.

b.   On October 3, 2011, STERLINGOV funded Mt. Gox Account 1 with 100 euros.

c.   On October 19, 2011, Mt. Gox Account 1 sent 36 BTC through an off-platform Bitcoin address to a second Mt. Gox Account (Mt. Gox Account 2) (registered to "nfs9000@hotmail.com").

d.   On October 20, 2011, Mt. Gox Account 2 sent 35 BTC to a third Mt. Gox Account (Mt. Gox Account 3) (registered to "kolbasa99@rambler.ru").

e.   On October 20, 2011, Mt. Gox Account 3 sent $80 USD to an account at Aurum Xchange (Aurum Xchange Account 1), another digital payment platform.

f.   On October 20, 2011, Aurum Xchange Account 1 sent $76 USD to Liberty Reserve Account 1.

g.   On October 25, 2011, Liberty Reserve Account 1 paid the domain fees for www.bitcoinfog.com to Highhosting.net.

This series of transactions is depicted in the below chart:



45.     An analysis of the IP addresses used to access the above Liberty Reserve and Mt. Gox accounts confirmed that the accounts shared a common owner: STERLINGOV.  For example, IP logs from Mt. Gox and Liberty Reserve showed that on November 24, 2011, a user using the IP address 212.117.160.123 logged into Mt. Gox Account 2, Mt. Gox Account 3, and Liberty Reserve Account 1, as well as another Liberty Reserve account registered to Roman STERLINGOV (Liberty Reserve Account 2).  STERLINGOV was also the named account owner of a third Liberty Reserve account (Liberty Reserve Account 3) registered using the email address heavydist@gmail.com (Google Account 1).

46.     Liberty Reserve records revealed that Liberty Reserve Account 2 was registered in STERLINGOV's true name using the email address plasma@plasmadivision.com, the same e-mail tied to Mt. Gox Account 1.  The account registration information included a residential address in Gothenburg, Sweden corresponding to STERLINGOV's home address.  Both Liberty Reserve Account 2 and Liberty Reserve Account 3 were registered using a Swedish telephone number, TELEPHONE NUMBER 1, which Swedish telecommunications provider records revealed is registered to STERLINGOV.

47.     On August 25, 2012, Mt. Gox Account 1 received a 180 BTC deposit sent from an account at BTC-e (BTC-e Account 1).  BTC-e was a virtual currency exchange that catered to

18

criminals and that was shut down by law enforcement in 2017.  According to records from BTC-e, BTC-e Account 1 was registered to Roman STERLINGOV, using Google Account 1.

48.    Records from Google pertaining to Google Account 1 revealed that the account was registered to "Roman Heavydist" and was linked to TELEPHONE NUMBER 1, identified above as STERLINGOV's phone number.  Investigators obtained the contents of Google Account 1 pursuant to a lawfully authorized search warrant.  Google Account 1's Google Drive folder contained Russian language document titled Ввод денег ("Putting Money"), dated September 29, 2011 (less than a month prior to the launch of BITCOIN FOG).  A translation of the document showed that the document appeared to be notes taken by STERLINGOV describing how to layer funds.  The steps outlined in the document match the steps that STERLINGOV took to pay for the domain www.bitcoinfog.com.  The below chart displays the relevant text of the document overlayed on the transaction path used by STERLINGOV to pay for the BitcoinFog.com domain.



***STERLINGOV's Receipt of Proceeds from BITCOIN FOG***

19

49.     BITCOIN FOG charged a variable fee of 2% to 2.5% on each deposit.  Blockchain analysis revealed that these fees were retained within the BITCOIN FOG cluster, and that the administrator made periodic withdrawals from the BITCOIN FOG cluster to pay himself.  These withdrawals occurred sporadically and in the same manner as a regular user.  The withdrawals appeared to be concealed to blend in with regular mixing transactions in order to protect the site administrator from scrutiny.   Based on BITCOIN FOG's transaction activity over time, STERLINGOV would have made approximately $8 million in commissions from BITCOIN FOG transactions if he had cashed out the administrative fees near the time that the transactions occurred.  Due to the significant increase in value of bitcoin over the course of BITCOIN FOG's operation—from a low of approximately $2 shortly after BITCOIN FOG launched in fall 2011 to a top value of $69,000 during 2021, and current value of $20,000—STERLINGOV was able to reap significant appreciation from his profits that were kept in bitcoin.

50.     IRS-CI examined bitcoin accounts controlled by STERLINGOV at several cryptocurrency exchanges.  Analysis of Sterlingov's accounts revealed the vast majority of cryptocurrency deposited into his accounts was originally sourced and traced back to BITCOIN FOG.  STERLINGOV utilized a variety of methods to remove BTC from BITCOIN FOG, including conducting direct transfers to exchange accounts held in his name, withdrawing funds from BITCOIN FOG to intermediary BTC wallets before cashing out BTC through exchanges, and using BTC from BITCOIN FOG to purchase goods and services, gift cards, and other cryptocurrencies.

**BITCOIN FOG SOCIAL MEDIA ACCOUNTS**

51.     BITCOIN FOG's launch was announced in an October 27, 2011, posting titled

20

"[ANNOUNCE] Bitcoin Fog: Secure Bitcoin Anonymization" on the BitcoinTalk.org online forum. BitcoinTalk.org was a popular forum for Bitcoin users. The announcement was posted by a user with the pseudonym Akemashite Omedetou (Japanese for "Happy New Year") and included links to a clearnet website for BITCOIN FOG (www.bitcoinfog.com), the Tor onion site (http://foggeddriztrcar2.onion), and a Twitter account for updates (www.twitter.com/#!/@Bitcoinfog) (the TARGET ACCOUNT).

52.     The announcement post by Akemashite Omedetou described BITCOIN FOG as a tool to make it difficult for "interested parties, be it authorities or just interested researchers" to trace users' Bitcoin transactions across the Bitcoin network. The post stated that BITCOIN FOG: "mix(es) up your bitcoins in our own pool with other users…get paid back to other accounts from our mixed pool…can eliminate any chance of finding your payments and making it impossible to prove any connection between a deposit and a withdraw inside our service."

53.     The TARGET ACCOUNT was established at Twitter on or about October 27, 2011, the date on which BITCOIN FOG was launched. That same day, the TARGET ACCOUNT tweeted that the site was operational and directed users to the clearnet site of bitcoinfog.com, as well as a .onion site.

54.     BITCOIN FOG used the TARGET ACCOUNT to communicate with BITCOIN FOG users. For example, on or about November 25, 2011, the TARGET ACCOUNT posted an announcement, "The deposit fee is now random between 1% and 3%. This is done to force come extra payout security." Based on my training and experience, and my review of other posts from BITCOIN FOG, I understand that this tweet referenced the service randomizing its fees to make it more difficult for investigators to trace transactions. On or about November 14, 2014, the

TARGET ACCOUNT tweeted a link to http://foggeddriztrcar2.onion, the new hidden services address for BITCOIN FOG.  On or about November 10, 2011, the TARGET ACCOUNT tweeted about an announcement that Akemashite Omedetou had made on BitcoinTalk.org.

55.     The TARGET ACCOUNT regularly posted updates regarding the status of the BITCOIN FOG hidden site.  For example, on or about November 9, 2011, the TARGET ACCOUNT tweeted, "Our freenet website provider seems to be down," and instructed users to access the .onion address directly.  On or about February 13, 2012, the TARGET ACCOUNT announced the launch of a support form on BITCOIN FOG.  On or about May 1, 2012, the TARGET ACCOUNT announced that BITCOIN FOG would be undergoing a server upgrade.

56.     The TARGET ACCOUNT also tweeted links to stories discussing why users should tumble bitcoins—in order to thwart law enforcement.  For example, on or about September 13, 2017, the TARGET ACCOUNT tweeted a link to a story about the IRS using blockchain analysis software to track bitcoin.  On or about June 11, 2019, the TARGET ACCOUNT tweeted a link to a Europol press release announcing the law enforcement takedown of Bestmixer.io, another Bitcoin mixer/tumbler, commenting: "this is why you need to use ONLY a Tor-based mixing service (Such a surprise)."

57.     The last public Tweet made by the TARGET ACCOUNT was in or about June 2019.  However, the account remains active and the tweets are publicly viewable, as Twitter accounts typically remain active absent affirmative action by Twitter or the account holder.

**BACKGROUND CONCERNING PROVIDER'S ACCOUNTS**

58.     In my training and experience, and based on my review of Twitter's website and law enforcement guide, I have learned the following:

59.     Twitter owns and operates a social networking and microblogging service of the same name that can be accessed at http://www.twitter.com and via the Twitter mobile application ("app").  Generally, Twitter allows users to register and create an account; to personalize (if desired) an account profile page; and to send and receive communications via the platform. These functionalities are discussed in more detail below.

60.     Twitter permits its users to communicate via messages that can contain photos, videos, links, and/or a maximum of 280 characters of text.  Users can choose to share these messages, called "Tweets," with the public or, alternatively, to "protect" their Tweets by making them viewable by only a preapproved list of "followers."  Each Tweet includes a timestamp that displays when the Tweet was posted to Twitter.  Users can also Tweet a copy of other Tweets ("retweet") or Tweet a reply to another Tweet.  Users can also indicate that they like a Tweet by clicking on a heart icon that appears next to each Tweet on the platform.

61.     Twitter also permits its users to exchange private messages, known as "direct messages" or "DMs," with other Twitter users.  DMs, which also may include photos, videos, links, and/or text, can only be viewed by the sender and designated recipient(s).  Direct messages may be sent to an individual user or to a group of up to 50 Twitter users.  Twitter users have the ability to choose whether they can receive a direct message from anyone.  At any time, a Twitter user has the ability to alter the settings on their Twitter account so that they can receive direct messages only from (1) individuals to whom the user has already sent a direct message and (2) Twitter accounts that the user "follows" via his account.

62.     While individuals are not required to register with Twitter to view the content of unprotected Tweets, individuals must register for a Twitter account to send Tweets, to "follow"

23

accounts in order to view protected Tweets, and to send and receive direct messages.  A user may register for an account for free by visiting Twitter's website or via the Twitter app.  When a user creates a new Twitter account, Twitter assigns that account a unique user ID ("UID").  A user must also select a password as well as a unique Twitter username (also known as a "handle").  Twitter then appends the @ symbol in front of whatever username the user selects to create the Twitter username (for example: @example).  The user may also select a different name (the "display name"), which is not automatically preceded by the @ symbol, to be displayed on his profile picture and at the top of his Tweets alongside his Twitter username. The display name can include symbols similar to emojis.  The user can change their password, username, and/or display name at any time, but the UID for the account will remain constant.

63.     While anyone can sign up and use Twitter for free, as of November 2021 Twitter also offered a subscription model that offered users access to additional features and app customizations.  This new subscription is called Twitter Blue.  A user can sign up for Twitter Blue at any time.

64.     At the time of account creation, Twitter asks the user for certain identity and contact information, including: (1) name; (2) email address and/or telephone number; and (3) month and year of birth.  Twitter also keeps certain information relating to the creation of each Twitter account, including: (1) the date and time at which the user's account was created; and (2) the method of account creation (e.g., website or Twitter app).

65.     Upon the creation of a Twitter account, a generic profile page is automatically created for the user.  This page displays information including (1) the user's Twitter username; (2) the display name; (3) the number of Twitter accounts the user is following; (4) the number of

Twitter accounts that are following the user; and (5) Tweets sent by the user (although, as noted above, if the user has chosen to protect their Tweets they will be visible only to preapproved "followers").  The user can personalize this page by posting a personal picture or image (known as an "avatar") to appear on the page and/or a banner image to appear across the top of the profile page.  The user can also add text to create a short biography, to identify his location, to provide a link to his website, or to specify his date of birth.

66.     As noted above, Twitter users can use their account to send and receive communications.  If a Tweet includes a Twitter username that is preceded by the @ symbol, that is referred to as a "mention."  The Twitter user mentioned in the Tweet will receive a notification informing them that they have been mentioned and showing the content of that Tweet.  Similarly, if another Twitter user replies to a Tweet sent by a user, the user who sent the original Tweet will receive a notification that someone replied to their message, and the notification will show the content of that reply.

67.     Twitter users can also include links to webpages in their Tweets and Direct Messages.  Twitter automatically processes and shortens links provided by the user to a shortened link that starts http://t.co/.  Twitter tracks how many times these shortened links are clicked.

68.     A registered Twitter user can also "like" a Tweet by clicking a heart icon on a Tweet sent by another user.  If another user "likes" a Tweet that is posted by the Twitter user, a notification will appear in the user's account identifying what Tweet was liked and who liked it.

69.     As noted above, users can include photographs, images, and videos in their Tweets.  Each account has a "media timeline" on their profile that displays "the photos, videos,

and GIF's [the accountholder] has uploaded with [their] Tweets." An individual can view a Twitter user's media timeline by visiting the user's Twitter profile page.

70.     Twitter users can also opt to Tweet with their location attached. This functionality is turned off by default, so Twitter users must opt-in to utilize it. However, if a Twitter user enables Twitter to access their precise location information, the Twitter user will have the option of attaching their location (e.g., the name of a city or neighborhood) to a Tweet at the time it is sent. If the user uses Twitter's in-app camera to attach a photo or video to the Tweet while the functionality is enabled, the Tweet will include both the location label (e.g., the name of a city or neighborhood) of the user's choice as well as the device's precise location in the form of latitude-longitude coordinates. The user can turn this functionality off (thereby removing their location from their Tweets) at any time, and they can delete their past location data from Tweets that have already been sent.

71.     A Twitter user may choose to "follow" another Twitter user. If a Twitter account is unprotected (i.e., privacy settings have not been enabled), the user can follow another user simply by clicking the "follow" button on the other user's Twitter profile page. If a Twitter account is protected (i.e., privacy settings have been enabled), the user can follow another user by clicking the "follow" button and waiting for the other user to approve their request. Once an account is followed by a Twitter user, the Tweets posted by the account the user follows will appear in the user's Twitter Home timeline. Every time a Twitter user follows another account, Twitter sends a notification to the account being followed to inform them about the new follower. Each user's Twitter profile page includes a list of the people who are following that user and a list of people whom that user follows. Twitter users can "unfollow" other users whom

26

they previously followed at any time.  Twitter also provides users with a list of "Who to Follow," which includes a few recommendations of Twitter accounts that the user may find interesting based on the types of accounts that the user is already following and who those people follow.

73.     A Twitter user can also "block" other Twitter users.  This prevents the blocked account from contacting or following the user or from seeing the user's Tweets.  Twitter does not notify the user of a blocked account when another Twitter account blocks them.

73.     A Twitter user can also use Twitter's integrated search function.  When a user types a search term into Twitter's search tool, it will return results that include accounts, Tweets, and photos that match that search term.  Twitter users using the service via the Twitter mobile app also have the option of saving searches that they have performed.  A user can delete such saved searches at any time.

74.     A Twitter user can also join or create "Lists" of other Twitter accounts.  These Lists often organize Twitter accounts by group, topic, or interest.  Viewing a timeline of a specific List will show you a stream of Tweets made only by accounts that are on that List.  Users can pin their favorite lists to their Twitter Home timeline page.  Twitter users have the ability to remove their accounts from Lists upon which it may appear.

75.     Twitter also offers a functionality called "Spaces," which it calls "a new way to have audio conversations on Twitter."  Any user can create a Space; that user is referred to as the "host."  Spaces are public, so anyone can join and listen to the conversation within a Space once it is created, although a user can send another Twitter user a link to their Space and invite them to join.  By default, the only individuals permitted to speak in a Space are the individuals that the

host invites to do so, although this setting can be modified to allow a broader set of individuals to speak. Up to 13 people can be in a Space at a given time.

76.     Twitter also offers the ability to sign into third-party apps and websites using one's Twitter account. Typically, the third-party app or website will have a link that enables the user to sign into the third-party service using their Twitter account. Doing so grants the third-party service access to the Twitter user's account. Depending on the authorizations the Twitter user gives to the third-party service, the third-party service may be able to read the user's Tweets, see who the user follows on Twitter, post Tweets to the user's profile, or access the user's email address. A user can revoke a third-party app or website's authorization to access their Twitter account and associated data at any time.

77.     Twitter collects and retains information about a user's use of the Twitter service, to include: (1) content of and metadata relating to Tweets and Direct Messages; (2) photos, images, and videos that are shared via Twitter and stored in the user's Media Timeline; (3) the identity of the accounts that a user follows and the accounts that follow the user's account; (4) the content uploaded to a user's profile page, including their avatar, banner image, and bio; (5) information about Tweets the account has liked; (6) information about Lists associated with the account; (7) information about the Spaces that a user has participated in, including the host of the Space, its start and end times, and information about other attendees; and (8) applications that are connected to the Twitter account. Twitter also collects and retains various other data about a user and his/her activity, including:

  a.     logs of Internet Protocol ("IP") addresses used to login to Twitter and the timestamp associated with such logins;

b.      transactional records reflecting, for example, when a user changed their display name or email address;

c.      the identities of accounts that are blocked or muted by the user; and

d.      information relating to mobile devices and/or web browsers used to access the account, including a Twitter-generated identifier called a UUID that is unique to a given device.

78.     In some cases, Twitter users may communicate directly with Twitter about issues relating to their account, such as technical problems or complaints.  Social networking providers like Twitter typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.  Twitter may also suspend a particular user for breaching Twitter's terms of service, during which time the Twitter user will be prevented from using Twitter's services.

79.     Additionally, providers of electronic communications services and remote computing services often collect and retain user-agent information from their users.  A user agent string identifies, among other things, the browser being used, its version number, and details about the computer system used, such as operating system and version.  Using this information, the web server can provide content that is tailored to the computer user's browser and operating system.

80.     In my training and experience, evidence of who was using a Twitter account and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why,

29

when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

81.     Based on my training and experience, messages are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Thus, stored communications and files connected to a Twitter account may provide direct evidence of the offenses under investigation and can also lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

82.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Twitter can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information and logs may be evidence of who used or controlled the account at a relevant time. Similarly, device identifiers and IP addresses can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

83.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

84.     Other information connected to the use of an account may lead to the discovery of additional evidence.  For example, accounts are often assigned or associated with additional identifiers such as account numbers, advertising IDs, cookies, and third-party platform subscriber identities.  This information may help establish attribution, identify and link criminal activity across platforms, and reveal additional sources of evidence.

85.     Therefore, Twitter's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Twitter.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## REQUEST TO SUBMIT WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

86.     I respectfully request, pursuant to Rules 4.1 and 41(d)(3) of the Federal Rules of Criminal Procedure, permission to communicate information to the Court by telephone in connection with this Application for a Search Warrant.  I submit that Assistant United States Attorney Christopher B. Brown, an attorney for the United States, is capable of identifying my voice and telephone number for the Court.

## **CONCLUSION**

87.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on PROVIDER, who will then compile the requested records at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.  Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

_____

Leo Rovensky
Special Agent
Internal Revenue Service – Criminal
Investigation

Subscribed and sworn telephonically pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on August 9, 2022.

_____
HONORABLE ROBIN M. MERIWEATHER
UNITED STATES MAGISTRATE JUDGE

## <u>CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)</u>

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are the original records or true duplicates of the original records in the custody of BitcoinTalk.org. The attached records consist of BitcoinTalk.org (pages/CDs/megabytes). I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of BitcoinTalk.org, and they were made by BitcoinTalk.org as a regular practice; and

b.      such records were generated by BitcoinTalk.org electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of BitcoinTalk.org in a manner to ensure that they are true duplicates of the original records; and

1

2.      the process or system is regularly verified by BitcoinTalk.org, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.


_____          _____
Date                                                      Signature


                                                          _____
                                                          Name and Title